FILED
COURT OF APPEALS
DIVISION II

2014 JAN 14 AM 9: 26

STATE OF WASHINGTON

BY

DEPUTY

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 43332-0-II |
| Respondent, | |
| v. | |
| DUANE MICHAEL RADER, | UNPUBLISHED OPINION |
| Appellant. | |

PENOYAR, J. — Duane Rader appeals his first degree arson, felony harassment, unlawful imprisonment, and fourth degree assault domestic violence related convictions against his then wife H.R.[1] Rader argues the trial court erred when it admitted into evidence (1) prior misconduct testimony under ER 404(b), (2) expert testimony on the general dynamics of domestic violence, and (3) statements he made to a treating physician's assistant. Rader also argues there was insufficient evidence for the jury to find the aggravating factor that the arson and unlawful imprisonment charges occurred within the sight or sound of the victim's minor child. In his statement of additional grounds (SAG), Rader argues the trial court improperly calculated his offender score. Because the trial court improperly admitted the prior misconduct testimony under ER 404(b), we reverse and remand for further proceedings.

FACTS

I. BACKGROUND

Rader and H.R. met online in January 2010. In August 2010, they met in person and began a dating relationship, and quickly moved in together. Rader and H.R. were married on January 3, 2011.

---

[1] It is appropriate to provide some confidentiality in this case. Accordingly, initials will be used in the body of the opinion to identify certain parties involved.

H.R. testified that after they were married, Rader became controlling and he started physically and mentally abusing her. H.R said that between mid-January and mid-February Rader pushed her approximately eight times when she tried to leave during arguments, one time pushing the back of her head causing her head hit the door. According to H.R., in mid-January Rader threatened her approximately once or twice a week, and told her that if she left him, he would hurt her and her 11-year-old daughter. He also told H.R. that she was worthless and that he deserved better.

II. FACTS RELATED TO THE CRIMES CHARGED

H.R. testified that on the evening of February 13, 2011, she and Rader were in their living room together, and when Rader poured himself a drink she asked him to stop drinking. Rader responded that he would "drink everything in the house if he wanted to." 3 Report of Proceedings (RP) at 421. After Rader's comment, H.R. went upstairs to go to bed. Approximately an hour after H.R. went to bed, Rader went upstairs, slammed open H.R.'s bedroom door, and told her that she "was evil and that he had a bullet he was going to put in [her] head." 3 RP at 426.

Rader then went back downstairs to the living room and H.R. got up, wearing just a tank top and underwear, and started downstairs to get her purse so that she could leave with her daughter. As she was walking downstairs, H.R. heard her daughter "kind of awake in her room." 3 RP at 432. H.R. went into the kitchen to retrieve her purse. Rader also went into the kitchen, grabbed H.R. by the back of her head, hit her head on the counter, and tossed her to the floor, causing her head to bruise. While she was still on the floor, Rader again told H.R. that she was evil and had to die and poured lighter fluid on her legs. He then tossed a lit match on her legs, causing her legs to catch fire. H.R. began screaming and grabbed a blanket off the couch to wrap

2

around her legs. H.R. went upstairs to soak her legs in cold water and then put aloe vera gel on them, which failed to soothe the pain.

H.R. then went back downstairs to get her phone and call 911. On her way downstairs, H.R.'s daughter poked her head of her room. H.R. testified that her daughter "was frantic. She was just terrified. . . . She was crying and asking . . . what all the yelling was about and what was wrong." 3 RP at 463. Rader objected to H.R. calling 911 and threatened to hurt H.R. and her daughter if she told the truth; so H.R. promised not to tell the truth. H.R. told the 911 operator and the firemen, EMT, and police officers who responded that she was filling a Zippo lighter when she spilled lighter fluid on herself. Rader told deputy sheriff Tyson Beall that he was smoking a cigarette by the back door when the couch accidentally caught on fire.

H.R. and her daughter were taken to the hospital. When Rader visited H.R. at the hospital the next morning, he again threatened to hurt her and her daughter if she told the truth. H.R. remained in the hospital for five days, was in severe pain for about a month, and could not walk without a walker or crutches for about a month.

Several days later, Rader went to an aid station on Joint Base Lewis-McChord and was treated for burns on his right hand and left foot by Physician's Assistant Rebecca Bean. Rader told Bean that he had been burnt by a fire that he started while he was drunk. He also told Bean he had not come in sooner because his wife was also burned and that he had been in the hospital with her.

At the beginning of May 2011, H.R. and her daughter moved to Bellingham to care for H.R.'s sick grandmother. By August 2011, H.R. felt safe enough being away from Rader that she told the police what really happened on February 13, 2011. After Rader was arrested, he attempted to call H.R. ten times while in jail, completing three of those calls on August 18, 2011

3

between 12:55 PM and 5:30 PM. In one of the calls, Rader stated, "It happened. . . . That night ruined my life." 3 RP at 568.

III.    PROCEDURAL HISTORY

The State charged Rader with: (1) first degree attempted murder with child enhancement/domestic violence; (2) first degree arson with child enhancement/domestic violence; (3) felony harassment/domestic violence; (4) unlawful imprisonment with child enhancement/ domestic violence; (5) tampering with a witness/domestic violence; (6) fourth degree assault/domestic violence (February 13, 2011); (7) fourth degree assault/domestic violence (between April 1 and April 30, 2011); (8)-(10) violation of a pretrial no contact order/domestic violence.

Prior to trial, the State moved to admit the testimony of Rader's former spouse R.R. to bolster the credibility of H.R., arguing that the testimony was important in light of H.R.'s delay in claiming abuse. Prior to marrying H.R., Rader was married to R.R. for seven years (March 2003 to April 2010). According to R.R., about a month after they married, Rader threw things at R.R. during an argument. Again a few months later, R.R. said Rader punched her in the arm. R.R. said that in 2004 Rader threw a plate at her, and during another argument, he threw a beer bottle at her. Following an argument in 2005, R.R. said Rader pursued her, grabbed her by the arms, and threw her in his vehicle. R.R also testified that in 2008, while she was in their driveway, Rader grabbed her by her hair and slammed her head into the pavement, and shortly thereafter Rader grabbed R.R. by her hair again.

During their seven-year marriage, R.R. said that she never reported the abuse to the police because she was afraid Rader would harm her, her children, or her family. R.R. said Rader threatened to kill her children in front of her and made several other threats during the

4

duration of their marriage. R.R. also said Rader told her she was not good enough and said that women were evil, worthless, and useless. Rader and R.R. divorced in April 2010. The trial court found the prior misconduct testimony properly admissible under ER 404(b) as part of a common scheme or plan.

The State also moved to admit Peg Cain's expert testimony "regarding the dynamics of domestic violence . . . and the reasons why these dynamics often lead to seemingly inconsistent conduct on the part of victims." Clerk's Papers (CP) at 135. The trial court ruled that the expert testimony regarding the general dynamics of domestic violence was admissible "due to the nature of the disclosure in this case [which] occurred substantially after the alleged incident." CP at 29.

Rader moved to exclude his statements to Bean, the physician's assistant who treated him at Joint Base Lewis-McChord. Specifically, he wanted the statements that he started the fire while he was drunk and that his wife was also burned excluded. The trial court found the physician-patient privilege inapplicable and "that the public interests outweighs the application of the privilege." 1 RP 133.

Rader pleaded guilty to the three violation of no contact order charges. CP at 17-22. The jury found Rader guilty of (1) first degree arson/domestic violence, (2) felony harassment/domestic violence, (3) unlawful imprisonment/domestic violence, and (4) fourth degree assault (February 13, 2011)/domestic violence. The jury also found the aggravating factor that the arson and unlawful imprisonment were committed in the presence of a child.

At the sentencing hearing, the parties agreed to Rader's offender score, the crimes' seriousness levels, and the sentencing ranges. Due to the aggravating factor, the trial court imposed an exceptional sentence of 120 months. Rader timely appeals.

ANALYSIS

I.    PRIOR MISCONDUCT–ER 404(b) EVIDENCE

Rader argues the trial court erred when it admitted R.R.'s testimony as part of a common scheme or plan. We conclude that Rader's alleged abuse of the two women did not contain distinctive features sufficient to allow the alleged prior misconduct to prove much more than Rader's propensity for domestic violence. The State sought to admit the ER 404(b) evidence to bolster H.R.'s credibility, but the defendant's propensity to commit a crime is not a proper inquiry for determining the victim's credibility. Accordingly, the trial court erred by admitting this evidence and we reverse.

A.    Standard of Review

We review a trial court's interpretation of ER 404(b) de novo as a question of law. *State v. Fisher*, 165 Wn.2d 727, 745, 202 P.3d 937 (2009). If the trial court correctly interpreted ER 404(b), we review the trial court's decision to admit prior misconduct evidence to determine if the trial court relied on unsupported facts, applied the wrong legal standard, or adopted a position no reasonable person would take. *Fisher*, 165 Wn.2d at 745; *State v. Lord*, 161 Wn.2d 276, 284, 165 P.3d 1251 (2007).

A trial court must always begin with the presumption that evidence of prior misconduct is inadmissible. *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). Under ER 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." The evidence may, however, "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b).

We read ER 404(b) in conjunction with ER 403, which requires the trial court to exercise its discretion in evaluating whether relevant evidence is unfairly prejudicial. Before a trial court admits evidence of prior misconduct under ER 404(b), it must (1) find by a preponderance of the evidence that the prior misconduct occurred, (2) identify the purpose for admitting the evidence—here, to prove a common scheme or plan, (3) determine the relevance of the evidence to prove an element of the crime, and (4) weigh the probative value of the evidence against its prejudicial effect. *Fisher*, 165 Wn.2d at 745; *DeVincentis*, 150 Wn.2d at 17.

Rader does not challenge the trial court's oral ruling that the State proved the evidence of prior misconduct by a preponderance of the evidence. Unchallenged findings are treated as a verity on appeal. *State v. Chanthabouly*, 164 Wn. App. 104, 129, 262 P.3d 144 (2011), *review denied*, 173 Wn.2d 1018, 272 P.3d 247 (2012). Accordingly, we must determine whether the trial court admitted the evidence on appropriate legal grounds.

B.      Common Scheme or Plan

Prior misconduct evidence is admissible to show a common scheme or plan under ER 404(b) where (1) the evidence of prior acts is part of a larger, overarching plan; or (2) the evidence of prior acts follows a single plan to commit separate but very similar crimes. *DeVincentis*, 150 Wn.2d at 19. The instant case deals with the second type of common scheme or plan, a single plan followed to commit separate but very similar crimes. Such a common scheme or plan "may be established by evidence that the Defendant committed markedly similar acts of misconduct against similar victims under similar circumstances." *State v. Lough*, 125 Wn.2d 847, 852, 889 P.2d 487 (1995). Evidence of such a plan "'must demonstrate not merely similarity in results, but such occurrence of common features that the various acts are naturally to be explained as caused by a general plan of which the charged crime and the prior misconduct

7

are the individual manifestations.'" *DeVincentis*, 150 Wn.2d at 19 (quoting *Lough*, 125 Wn.2d at 860). But such common features need not show a unique method of committing the crime. *DeVincentis*, 150 Wn.2d at 20-21.

When evaluating whether the prior and current misconduct are part of a common scheme or plan, the trial court examines the whole, not a part, of the planning, preparation, and execution of the misconduct. "[T]he preferred approach is for the trial court to focus on the closeness of the relationship between the other misconduct and the charged crimes in terms of time, place and modus operandi." *Lough*, 125 Wn.2d at 858. Although a unique modus operandi is one factor to consider, the crux of the inquiry is similarity, not uniqueness. *DeVincentis*, 150 Wn.2d at 20. The degree of similarity for the admission of evidence of a common scheme or plan must be substantial. *DeVincentis*, 150 Wn.2d at 20.

Here, the State sought to admit R.R.'s testimony to bolster H.R.'s credibility. The trial court admitted R.R.'s testimony "for the purpose of establishing a common scheme or plan of behavior by the defendant relating to his behavior with this [sic] former wife, [R.R.], and his current wife [H.R.]." CP at 27. The trial court noted that this is not a case where Rader allegedly tried to burn R.R., but that the abuse of both women was similar enough "that it is appropriate that such prior evidence of domestic violence be admitted." 1 RP at 91.

We must determine whether the trial court was correct in finding "'such a concurrence of common features'" between Rader's alleged abuse of R.R. and H.R. that his alleged abuse of both victims was naturally to be explained as manifestations of a general plan; thus, making R.R.'s testimony admissible under ER 404(b). *DeVincentis*, 150 Wn.2d at 19-20 (quoting *Lough*, 125 Wn.2d at 856). To so find, we must examine whether there was anything distinctive about the way in which Rader allegedly abused these two women. In other words, were the

features of the abuse commonplace or was there something about the abuse that distinguishes it from that suffered by many victims of domestic violence. If the latter is true, then the test is met because distinctive abuse inflicted on multiple victims is naturally to be explained as manifestations of a general plan.

We hold that the alleged acts against R.R. and H.R., while emblematic of domestic violence, were not substantially similar and did not establish a common scheme or plan. Certainly there were common features in the alleged abuse of the two women: the victims were both married to Rader and they both stated Rader physically and verbally abused them. Rader, however, also allegedly committed different acts of abuse against each woman, e.g. he punched R.R. in the arm, but not H.R. and he set H.R. on fire, but did not set R.R. on fire.

Thus, while the alleged abuse that R.R. and H.R. suffered was similar, it also was common to the typical domestic violence case. Domestic violence is a persistent and pernicious problem and, unfortunately, the legal system and this court have seen much of it. The abuse routinely involves threats, assaults, and verbal abuse. As Cain, the domestic violence expert witness, testified, "Domestic violence is a pattern of verbal, emotional, psychological, social, sexual assault, or fear of imminent harm between intimate partners." 2 RP at 368. Cain stated that the hallmark of domestic violence is isolation and also controlling behavior. The State advanced no argument that the common elements of the alleged abuse of R.R. and H.R.—Rader pushed both H.R. and R.R., prevented them from leaving, and threatened them and their family's safety if they left—did not fit this usual pattern. Thus we cannot say that the abuse was distinctive or part of Rader's common scheme or plan, but only that he is allegedly inclined to abuse women.

Because propensity to commit a crime is not admissible under ER 404(b) and the probative value of the evidence was slight and its prejudicial effect significant, it was error to admit this evidence. We reverse and remand for further proceedings. Although we remand to the trial court, we address the following issues because they may repeat upon further proceedings on remand.

II.    EXPERT OPINION EVIDENCE

Rader argues that the trial court abused its discretion when it admitted expert testimony on the general dynamics of domestic violence. Rader contends that the irrelevant expert testimony was highly prejudicial and requires reversal. We hold the trial court properly exercised its discretion because expert testimony on domestic violence is admissible to explain why a victim may initially deny the abuse.

We review the trial court's decision to admit expert testimony to determine if the trial court's decision is based on unreasonable or untenable grounds. *State v. Kirkman*, 159 Wn.2d 918, 927, 155 P.3d 125 (2007); *In re Det. of Anderson*, 166 Wn.2d 543, 549, 211 P.3d 994 (2009) (citing *Indus. Indem. Co. of Nw., Inc. v. Kallevig*, 114 Wn.2d 907, 926, 792 P.2d 520 (1990)).

Expert testimony is properly admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, [the] witness qualifie[s] as an expert by knowledge, skill, experience, training, or education," and the basis of the expert's testimony is accepted by experts in the relevant field. ER 702-03. Under ER 702, expert testimony will be deemed helpful to the trier of fact only if its relevance can be established. *State v. Riker*, 123 Wn.2d 351, 364, 869 P.2d 43 (1994). An evidentiary error "is prejudicial if, 'within reasonable probabilities, had the error not occurred, the outcome of the

trial would have been materially affected.'" *State v. Neal*, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001) (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)).

In Washington, expert testimony pertaining to domestic violence is relevant to explain the seemingly inconsistent behavior of domestic violence victims. *See, e.g., State v. Allery*, 101 Wn.2d 591, 597, 682 P.2d 312 (1984) (holding expert testimony on the battered woman syndrome admissible to explain "why a person suffering from the battered woman syndrome would not leave her mate, would not inform police or friends, and would fear increased aggression against herself would be helpful to a jury in understanding a phenomenon not within the competence of an ordinary lay person."); *State. v. Ciskie*, 110 Wn.2d 263, 271, 751 P.2d 1165 (1988) (admitting expert testimony as to battered women syndrome to help the jury understand why the victim failed to leave the relationship or report the acts of violence); *State v. Grant*, 83 Wn. App. 98, 109, 920 P.2d 609 (1996) (noting that expert testimony pertaining to domestic violence can be valuable to explain apparent inconsistent conduct on the part of the victim).

The trial court admitted the expert testimony on the general dynamics of domestic violence because the "delay in [H.R.'s] disclosure creates credibility issues" and

> [P]erhaps [many jurors] would not have a detailed understanding of domestic violence, [thus,] this type of opinion evidence would be helpful in their assessment of the circumstances here that are alleged. And . . . this kind of evidence has come in other cases where it is appropriate as expert opinion, and it is generally accepted within the scientific community.

1 RP at 87-88.

At trial, Cain testified generally regarding what a typical domestic violence relationship looks like and how the offender and victim function within that relationship, but made no specific references to either party. *See* 2 RP at 368-71, 385 (discussing characteristics of the

11

offender); 2 RP at 372-77 (discussing the characteristics of the victim and reasons why the victim may not report the abuse). Rader contends that "evidence regarding the mental state or behavior of perpetrators was [not] relevant to either why [H.R.] did not immediately report her allegations or to any of the elements of the charged crimes." Appellant's Br. at 40-41. Rader also takes particular issue with Cain's statement that a woman typically leaves an abuser seven times before staying away and for others it may take fourteen times, "if they're not dead." 2 RP at 385.

Cain's testimony was offered to educate the jury on the general dynamics of domestic violence and to explain the inconsistencies of H.R.'s reporting of the abuse she suffered. Cain's testimony about perpetrators was relevant and properly admissible because it provided context for her testimony about victims generally and their typical responses to abuse. Although Cain's statement that victims may take as many as 14 times to leave their abuser "if they're not dead," may not be specifically relevant to the jury's evaluation of H.R.'s credibility, this minor error does not require reversal of Rader's conviction. Further, Rader did not object to this specific statement at trial.

III.    PHYSICIAN-PATIENT PRIVILEGE

Rader argues the trial court erred when it admitted statements he made to a treating physician's assistant regarding the cause of his burn-related injuries. Specifically, Rader contends the trial court improperly applied the balancing test between a criminal defendant's right to claim the physician-patient privilege and the public's interest in disclosure of his statement's to the physician's assistant. We disagree and hold the trial court carefully considered Rader's motion and properly exercised its discretion when allowing the physician's assistant to testify regarding Rader's statements.

We review a trial court's evidentiary rulings to determine if the trial court's decision is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. *State v. Finch*, 137 Wn.2d 792, 810, 975 P.2d 967 (1999).

The physician-patient privilege prevents a physician from testifying in a civil action about information the physician acquired when treating the patient, unless the patient consents. RCW 5.60.060(4). The purposes of the privilege are "to promote proper treatment by facilitating full disclosure of information[,]" and to protect the patient from embarrassment or scandal that might result if the intimate details of medical treatment were revealed. *Carson v. Fine*, 123 Wn.2d 206, 213, 867 P.2d 610 (1994). Information connected with obtaining medical treatment is that "which was necessary to enable [the physician] to prescribe or act for the patient." RCW 5.60.060(4).

Unlike all other privileges created by the statute, the legislature did not apply the physician-patient privilege to criminal cases. *State v. Smith*, 84 Wn. App. 813, 820, 929 P.2d 1191 (1997). Washington courts, however, have extended the physician-patient privilege to criminal prosecutions "so far as practicable" under RCW 10.58.010. *State v. Mark*, 23 Wn. App. 392, 396, 597 P.2d 406 (1979) (internal quotation marks omitted). In criminal cases, "[a]pplication of the privilege requires a balancing of the benefits of the privilege against the public interest of full revelation of the facts." *State v. Stark*, 66 Wn. App. 423, 438, 832 P.2d 109 (1992).

The domestic violence statute (ch. 26.50 RCW) reflects the legislature's belief that the public has an interest in preventing domestic violence. *State v. Dejarlais*, 136 Wn.2d 939, 944, 969 P.2d 90 (1998). Quoting this court, the Supreme Court stated:

The Legislature has clearly indicated that there is a public interest in domestic violence protection orders. In its statement of intent for RCW 26.50, the Legislature stated that domestic violence, including violations of protective orders, is expressly a public, as well as private, problem, stating that:

Domestic violence is a problem of immense proportions affecting individuals as well as communities. Domestic violence has long been recognized as being at the core of other major social problems: Child abuse, other crimes of violence against person or property, juvenile delinquency, and alcohol and drug abuse. Domestic violence costs millions of dollars each year in the state of Washington for health care, absence from work, services to children, and more. LAWS OF 1992, ch. 111, § 1.

*Dejarlais*, 136 Wn.2d at 944 (quoting *State v. Dejarlais*, 88 Wn. App. 297, 304, 944 P.2d 1110 (1997)).

Here, Rader told Bean that he started the fire when he was drunk and that his wife had also been burned. The trial court allowed Bean to testify to these statements because it determined that although the statements would subject Rader to embarrassment, "the jury's right to receive full information and make their own judgment, and the public interest in all of the facts surrounding the charges at issue here" outweighed the benefits of the privilege for Rader. 1 RP at 133. Rader argues the trial court improperly balanced the public's interest in full disclosure against only his potential embarrassment if the statements were revealed. In its written order, however, the trial court noted that the "privilege has been overcome and broken in this case by weighing the conflicting public policy issue of confidentiality and production [of] full information for a jury to make an informed decision." CP at 30. Further, the trial court heard extensive argument on the balancing test and cited to multiple legal authorities that discuss the balancing test when giving his oral ruling. Accordingly, Rader's argument that the trial court improperly considered only his potential embarrassment fails.

14

The trial court properly balanced the public's interest against the benefits of the privilege because the purpose of the privilege of encouraging full disclosure for proper medical treatment will not be promoted here and Rader's statements will be no more embarrassing than the charges already brought against Rader. *See State v. Boehme*, 71 Wn.2d 621, 637, 430 P.2d 527 (1967). Bean's ability to provide proper treatment was unaffected by Rader's statements that he started the fire and that his wife was also burned. *See* 2 RP 262 ("What I focused on as a provider was not how the fire had started.") Whereas Bean noted that Rader's statement that he was burned on February 13 (four days before seeing Bean) was particularly important to his treatment. Thus, the purpose of the privilege of promoting proper treatment by facilitating full disclosure of information is not served by excluding Rader's statement that he started the fire and his wife was also burned. As noted in *Dejarlais*, the public's interest in preventing domestic violence is great due to the public problems it creates. Accordingly, we hold the trial court properly exercised its discretion when balancing the public's interest in full disclosure against the benefits of the privilege and properly admitted Rader's statements to Bean.

V.   AGGRAVATING FACTOR

Rader argues there was insufficient evidence to prove the aggravating factor that either the arson or the unlawful imprisonment "occurred within sight or sound of the victim's . . . minor children." Appellant's Br. at 50.

We review a jury's special verdict finding the existence of an aggravating circumstance under the sufficiency of the evidence standard. *State v. Stubbs*, 170 Wn.2d 117, 123, 240 P.3d 143 (2010); *see also* RCW 9.94A.585(4) (stating that we may reverse a sentence outside of the standard range if "the reasons supplied by the sentencing court are not supported by the record."). Under this standard, "we review the evidence in the light most favorable to the State"

15

to determine whether any rational trier of fact could have found the presence of the aggravating circumstances beyond a reasonable doubt. *See State v. Yates*, 161 Wn.2d 714, 752, 168 P.3d 359 (2007) (quoting *State v. Varga*, 151 Wn.2d 179, 201, 86 P.3d 139 (2004)). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial and direct evidence are deemed equally reliable. *Yates*, 161 Wn.2d at 752. We defer to the jury on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004) (citing *State v. Cord*, 103 Wn.2d 361, 367, 693 P.2d 81 (1985)).

The trial court may impose an exceptional sentence when certain aggravating factors are present. RCW 9.94A.535. One of the aggravating factors states: "The current offense involved domestic violence . . . and one or more of the following was present: . . . (ii) The offense occurred within sight or sound of the victim's or the offender's minor children under the age of eighteen years[.]" RCW 9.94A.535(3)(h)(ii). This is an aggravating circumstance that the State must prove to the jury beyond a reasonable doubt. RCW 9.94A.537(3). When a jury finds this aggravating circumstance, the court may sentence the offender to a term of confinement up to the statutory maximum for the underlying conviction "if it finds . . . that the facts found are substantial and compelling reasons justifying an exceptional sentence." RCW 9.94.537(6).

Although it is clear H.R.'s daughter did not see the crimes, the evidence and testimony support a finding that her daughter heard the crimes happen. A rational trier of fact could have found H.R.'s daughter was awakened by Rader slamming open H.R.'s bedroom door and threatening to put a bullet in her head. A rational trier of fact could also have found that H.R.'s daughter heard Rader hitting H.R.'s head on the counter, then throwing her to the floor, and

16

lighting her on fire. The testimony that H.R. heard her daughter moving around in her bedroom, H.R. screaming after Rader lit her on fire, and the terror H.R.'s daughter exhibited when H.R. was upstairs after the crimes also support a determination that a rational trier of fact could have found H.R.'s daughter heard the arson and unlawful imprisonment crimes. Accordingly, we hold the there was sufficient evidence from which a rational trier of fact could find beyond a reasonable doubt that H.R.'s daughter heard the crimes being committed.

VI.    SAG ISSUE

Rader contends he should have only been given one point for the three violations of the no contact order on August 18, 2011, which he plead guilty to, because they should be deemed other current offenses under RCW 9.94A.525(1). RCW 9.94A.525(1) provides that "[c]onvictions entered or sentenced on the same date as the conviction for which the offender score is being computed shall be deemed 'other current offenses' within the meaning of RCW 9.94A.589." RCW 9.94A.589(1) states that when a person is sentenced for "two or more current offenses, the sentence range for each current offense shall be determined by using all other current and prior convictions as if they were prior convictions for the purpose of the offender score," unless the trial court enters a finding that some or all of the current offenses encompass the same criminal conduct, in which case those offenses shall be counted as one crime. One exception to this rule is in domestic violence cases.

Under RCW 9.94A.525(21)(c), where the present conviction is for a felony domestic violence offense, the trial court should "[c]ount one point for each adult prior conviction for a repetitive domestic violence offense as defined in RCW 9.94A.030 . . . [that] was plead and proven after August 1, 2011." Here, Rader's domestic violence offense—violation of a pretrial domestic violence no contact order under RCW 26.50.110(1)—falls within the definition of

17

RCW 9.94A.030, and he committed and pleaded guilty to the violations after August 1, 2011. The trial court did not enter a finding that the three violations of the no contact order encompass the same criminal conduct. Thus, Rader misinterpreted RCW 9.94A.525(1) and instead his three convictions for his violation of the no contact order are considered prior offenses and the trial court properly assigned one point for each of the three offenses under RCW 9.94A.525(21)(c).

Because Rader's abuse of R.R. and H.R. do not have any distinctive features, and instead, only represent what is commonplace for domestic violence, the trial court erred by admitting Rader's prior misconduct toward R.R. as part of a common scheme or plan under ER 404(b). We reverse and remand for further proceedings.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Penoyar, J.

We concur:

Maxa, J.

Schindler, J.

18