FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 MAY 21 AM 8: 43

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 75699-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| MAXIMO DIAZLEAL-DIAZLEAL, | ) | |
| | ) | |
| Appellant. | ) | FILED: May 21, 2018 |

SCHINDLER, J. — A jury convicted Maximo Diazleal-Diazleal of two counts of

domestic violence rape of a child in the first degree and one count of domestic violence

rape of a child in the second degree of his stepdaughter R. Diazleal-Diazleal seeks

reversal. Diazleal-Diazleal argues (1) the court erred by denying his motion to

reconsider admission of ER 404(b) common scheme or plan evidence and strike the

testimony of his daughter S., (2) the court erred in overruling his objection to the

demeanor testimony of a detective, and (3) cumulative error denied him a fair trial. We

affirm the jury convictions.

Sexual Abuse

In 2001, Maximo Diazleal-Diazleal and Marisol lived together in a house in

Renton with her 4-year-old daughter R. and her 3-year-old son J. In 2002 or 2003,

Diazleal-Diazleal and Marisol married. Marisol's 14-year-old sister N. lived with the family from approximately 2002 to 2003. In 2004, Marisol gave birth to S.

Beginning in approximately 2002, Diazleal-Diazleal would go into five-year-old R.'s room at night "two to three times a week" to "touch" and "rub" her "chest" and "private area." Diazleal-Diazleal told R. "it was secret." Diazleal-Diazleal taught R. "how to kiss him," put her "tongue inside of his mouth," and "bite or nibble on his . . . bottom lip." Diazleal-Diazleal would "grab and squeeze" R.'s nipples to "help" her breasts "grow." Diazleal-Diazleal inserted his partially amputated finger into R.'s vagina. Diazleal-Diazleal made R. "play with" his penis with her hands "[u]ntil he . . . ejaculated."

As R. got older, Diazleal-Diazleal started "doing more things." Some nights, R. would "wake up with [Diazleal-Diazleal's] penis in my mouth." Diazleal-Diazleal told R. to "suck on it." When she gagged, Diazleal-Diazleal "would make [R.] finish him off" with her hands. R. started "sleeping . . . facing the wall" because she "didn't want it to happen anymore."

When R. was eight or nine years old and in the second grade, the family moved to a "little house" in Kent. Diazleal-Diazleal continued to sexually abuse R. Diazleal-Diazleal would put her "breasts in his mouth" and "rub" her "vagina on his penis." When Marisol went to work, Diazleal-Diazleal began sexually abusing R. during the day as well as at night.

Diazleal-Diazleal started "incorporating" oral sex. R. "often" would "wake up" to Diazleal-Diazleal performing oral sex on her. Diazleal-Diazleal threatened R. not to tell anyone. Diazleal-Diazleal told R. that "without him," the family would "be homeless" and they "wouldn't have any money."

Diazleal-Diazleal engaged in sexual intercourse with R. for the first time in 2007 when she was 10 years old. After the family moved to a "big house" in Kent, R. often woke up with Diazleal-Diazleal "on top of" her. She was "scared and angry." Diazleal-Diazleal would cover her mouth and tell her to "stay quiet" while his "penis was inside" of her. R. said sexual intercourse with Diazleal-Diazleal caused pain and the "lower half" of her "stomach would hurt." R. started putting "things in front of the door so he wouldn't be able to come in" her room or to give herself "a warning" because it was "better than being wakened up and scared" by Diazleal-Diazleal.

Diazleal-Diazleal did not rape R. during the day. "In the daytime it wasn't sex. It would just be . . . hand jobs, blow jobs, and it was just . . . something quick." Diazleal-Diazleal would "forcefully carry" R. to the upstairs bedroom. She would "try to grab the walls or hold on to the door" but "he would just continue to pull" until she "let go."

Diazleal-Diazleal was "very strict" with R. and J. He would "scream a lot" and "was really abusive." Diazleal-Diazleal told R. that she "wasn't allowed to talk to boys." Diazleal-Diazleal was physically abusive toward Marisol and J. One time when Diazleal-Diazleal hit Marisol in the face and J. tried to protect his mother, Diazleal-Diazleal hit J.

R. became "closed off" from her family. R. "felt very on the outside" because "I was going through something that no one knew about." R. was ashamed because she "realized that what was going on wasn't okay." When R. was in the fifth or sixth grade, she told her best friend that she was molested as a child. R. did not tell her friend who molested her or that Diazleal-Diazleal continued to molest and rape her.

When J. was in the seventh grade, he saw Diazleal-Diazleal and R. "laying in bed . . . together." J. "didn't really understand what they were doing." Diazleal-Diazleal told J. to "get out" of the room. J. "closed the door" and left.

Diazleal-Diazleal had intercourse with R. for the last time when she was 13 or 14 years old before he "left the state" in approximately 2011. After Diazleal-Diazleal left, Marisol, R., J., and S. lived in temporary housing for two years before moving into a house in Kent. After Diazleal-Diazleal left, R. felt "relieved" that the sexual abuse "was going to stop." But she "still felt very paranoid" and "still slept near the wall." R. did not tell her mother about the abuse because she was "so ashamed and embarrassed." She "wanted to take this to [her] grave and did not want to tell anybody." After Diazleal-Diazleal left, Marisol noticed R. "appeared happier." She "talked more," "came out of her room more," and they "had a better bond."

R. told her high school boyfriend that "having sex consensually was very difficult" because of "the trauma" she "experienced growing up." R. told him there were "some things" she "just couldn't do." R. was "very vague" and did not disclose who abused her.

Diazleal-Diazleal returned to Washington in the summer of 2014. Diazleal-Diazleal wanted to resume his relationship with Marisol and "see the kids." Marisol "was never going back with him" because of "[e]verything that he threatened" her with and "all the abuse that he had" toward her and the children. But Marisol did want to give Diazleal-Diazleal the "opportunity to be a father" to S.

Diazleal-Diazleal lived with his brother Juan Diazleal-Diazleal and sister-in-law Mary Ciesleski. Marisol allowed 10-year-old S. to stay with Diazleal-Diazleal most "every weekend." Neither R. nor J. wanted to visit Diazleal-Diazleal.

In November 2014, S. told Marisol she "did not want to go over to [Diazleal-Diazleal]'s house." When Marisol responded, "[I]t's Friday, you're going to go to your dad," S. got very "[u]pset" and started crying.

R. noticed that after S. stayed with Diazleal-Diazleal on the weekends, S. acted "very odd." R. told her boyfriend "the whole truth"—that Diazleal-Diazleal sexually abused and raped her. Her boyfriend urged R. to tell her mother. R. decided she "had to" tell Marisol about the sexual abuse.

> After [Diazleal-Diazleal] . . . came back, I just felt like my sister was acting very odd and there was — she was around the same age where she starts, like, developing her body. And I felt like I seen myself inside of her, in a way. And I had to tell my mom. I knew I couldn't keep it a secret.

In January 2015, R. wrote a letter to her mother about Diazleal-Diazleal sexually abusing her because "just saying his name, I would cry. Anything related to, like, my childhood and him connected to it, I was very emotional." The letter to Marisol states:

> "Hey, mom, I know you're stressed and I can't seem to find the right words to say out loud. No, I am not pregnant, and no, I do not have an STD.[1] It's much worse.
>     "I have always been a shy kid and I'm sorry I'm not open with you, but I am now. And since I can remember, [Diazleal-Diazleal] would rape and molest me. It stopped when he left. I'm sorry I never told you. He told me he'd kill you and my brother. I'm just so ashamed that I never told anyone except for [my boyfriend] last week. And I don't want [S.] to see him anymore. I don't want her to have nightmares like me. And I don't want her to want to kill herself sometimes like me."

---

[1] Sexually transmitted disease.

Marisol contacted the police. Kent Police Department Special Assault Unit Detective Melanie Robinson interviewed R.

Marisol's younger sister N. disclosed that Diazleal-Diazleal molested her when she lived with the family from 2002 to 2003. S. told her mother that Diazleal-Diazleal touched her at night when she stayed with him. Detective Robinson interviewed N. and S.

Criminal Charges

The State charged Diazleal-Diazleal with two counts of domestic violence rape of a child in the first degree of R. between February 11, 2007 and February 10, 2009 and one count of domestic violence rape of a child in the second degree of R. between February 11, 2009 and February 10, 2011. Diazleal-Diazleal pleaded not guilty.

Defense Interviews

Defense counsel interviewed R., N., and S. before trial.

N. said that on multiple occasions, Diazleal-Diazleal came into her room during the day while she was sleeping and she would wake up to him kissing her. N. said that while they were alone in a car on her 15th birthday, Diazleal-Diazleal got into the back seat with her, took his penis out, and pressed it against her leg. N. said Diazleal-Diazleal threatened to kill her mother and brother if she told anyone.

S. said that when she stayed with Diazleal-Diazleal, she slept in the same bed with him. S. described one night when Diazleal-Diazleal "wrapped himself around" her legs and was "touching her upper thigh area with his hands." S. said Diazleal-Diazleal "touched/rubbed her stomach on the outside of her t-shirt, gradually moving his hands

upwards to the bottom of her breasts." When Diazleal-Diazleal began touching her leg again the next night, he told her "not to tell her mother about the touching."

Motion to Admit ER 404(b) Evidence

The State filed a motion to admit the testimony of N. and S. under ER 404(b) to explain the timing and circumstances of R.'s disclosure and to show a common scheme or plan. "[S]pecifically, the defendant engaged in a pattern of conduct that normalized sexual behavior with the children, which is sometimes referred to as grooming."

> [T]he grooming or desensitizing them, that is the scheme, to get them accustomed to him touching them, accustomed to him coming into the room, accustomed to sexual contact before he begins to have sexual intercourse with them.[2]

The State submitted transcripts from the defense interviews and the police reports that included Detective Robinson's interviews with R., N., and S.

The defense objected to admission of the ER 404(b) evidence of S. and N. under res gestae. The attorney asserted the defense was not "moving to exclude the reason why" R. "finally told her mom" and therefore, R. could testify about her observations of S. and reasons for disclosure.

The defense attorney deferred to the court on whether to hold an evidentiary hearing on the ER 404(b) evidence.

> I defer to the court under State v. Kilgore[3] and whether or not the court should hold an evidentiary hearing.
>     THE COURT:    It seems — and I did take a look at a number of cases going back a number of years, starting with Kilgore, and I wasn't able to find reported cases where the court did that. And, of course, there is a lot of good reasons not to do that —
>     [DEFENSE COUNSEL]:    Yes.

---

[2] The State also moved to admit uncharged crimes under ER 404(b) to show lustful disposition. The defense did not object.

[3] State v. Kilgore, 147 Wn.2d 288, 53 P.3d 974 (2002).

> THE COURT: — primarily getting these young women in and making them essentially tell the same very difficult painful story more than once.
>
> [DEFENSE COUNSEL]: Yeah, I think it's up to the court's discretion.

The defense argued the ER 404(b) evidence of N. and S. was not admissible to show a common scheme or plan. The defense conceded that "in an overarching sense, . . . [w]e have these common similarities . . . . [T]hey have the same gender. They are children." But the defense attorney argued, "[W]e don't have unique or distinguishing factors."

The court ruled the testimony was not admissible under res gestae to "explain why [R.] disclosed her abuse by the defendant at the time that she did. . . . [W]hat's relevant is what [R.] observed about [S.]'s demeanor and [S.]'s reluctance to go and spend time with her father."

In addressing the ER 404(b) evidence, the court found by a preponderance of the evidence that the acts occurred. "[T]heir stories were relatively straightforward, they did not appear to be exaggerating, and there wasn't any apparent motive . . . for fabrication." The court found the testimony is "primarily being offered to show a common scheme or plan by the defendant to molest or rape young girls who are under his authority and at the time were residing and sleeping in his home."

The court concluded the testimony of N. was not admissible under common scheme or plan because Diazleal-Diazleal kissed her during the day and the conduct in the car was "not similar."

> Here, as I stated before, there certainly were some commonalities. [N.], [R.] and [S.] were all preadolescent or adolescent girls who were living, at the time, in the defendant's household, or at least sleeping there and spending the night there.

The state's offer of proof indicates that for [R.] and [S.], the inappropriate touching occurred at night, when other members of the household were asleep. In [N.]'s case, the touching occurred in her bedroom when she had laid down for a nap, but it was during the day. In all three cases, the initial abuse occurred in the room where the girls slept.
. . . However, in [N.]'s case, she doesn't describe any touching by the defendant with his hands.

The court ruled the testimony of S. was "admissible as evidence of a common scheme or plan" under ER 404(b). The court found the offer of proof showed grooming. The court found the "inappropriate touching" that S. described was "sufficiently similar to [R.]'s descriptions of the initial" sexual abuse by Diazleal-Diazleal. The court found the probative value of the evidence outweighed the danger of unfair prejudice.

Trial

During opening statement, the defense attorney told the jury R. and S. "falsely accused" Diazleal-Diazleal of rape and sexual abuse.

Now, the glue that kept this dysfunctional family together was [Diazleal-Diazleal]'s love of his daughter, [S.]. That glue came apart when [R.], Marisol's daughter, falsely accused him of raping her and of other inappropriate sexual abuse. And then to the heartbreak of [Diazleal-Diazleal], his own daughter falsely accused him of rape.

Several witnesses testified during the two-week trial, including Detective Robinson, Marisol, J., R's best friend, R's high school boyfriend, S., and R.

Marisol testified that when she lived with Diazleal-Diazleal, he would get up "in the middle of the night" two to three times a week and leave their room for "20 minutes. Sometimes 15 minutes." Diazleal-Diazleal told Marisol he was "getting something to drink downstairs."

Marisol testified that when Diazleal-Diazleal returned in 2014, they argued about S. Diazleal-Diazleal "threatened that he was going to take away" S. because he wanted

his " 'family back.' " Marisol told Diazleal-Diazleal, " 'Do you think they are going to give my daughter to a guy that abused not only me, but [R.] and [J.]' "?

Before the recess of the trial, defense counsel asked the court to give a proposed defense limiting instruction to the jury before S. testified the following Monday.

When the trial resumed on Monday, the prosecutor told the court S. had "expressed hesitation" about testifying. The prosecutor said S. is "not going to be as forthcoming, or I think it's going to be a little harder to get her to testify." The court confirmed defense counsel wanted the court "to give the instruction first" before S. testified.

The State called S. to testify. Before S. testified, the court used the defense proposed limiting instruction to instruct the jury as follows:

> So, ladies and gentlemen, <u>the evidence is going to be presented in this case regarding [S.]'s accusations that the defendant had sexual contact with her. The defendant is not on trial for any act, conduct or offense that is not charged in this case. [S.]'s accusations would be admitted for the limited purpose of showing a common scheme or plan regarding the charged crimes involving [R.]. You must not consider this evidence for any other purpose.</u> Evidence of any sexual offense against [S.] is not proof beyond a reasonable doubt that the defendant is guilty of the crimes charged in this case. The state has the burden of proving, beyond a reasonable doubt, that the defendant committed each of the elements of the crimes that are charged.[4]

S. testified that she stayed with Diazleal-Diazleal on weekends and "slept with him" in his bed at night. S. said that as she was "falling asleep" one night, Diazleal-Diazleal "started grabbing onto my legs . . . like mid-thigh." S. was lying on her back and Diazleal-Diazleal was lying on his side facing her. S. testified that he "put his hand there and then started, like, moving it around. And then I told him to stop." S. testified

---

[4] Emphasis added.

Diazleal-Diazleal was moving his hand slowly for about 10 seconds on her thigh. S. testified she could not fall asleep "[b]ecause of him." S. said she was "scared" and ran out of the room to call her mother. S. said she wanted to call her mother because she "wanted to go home . . . [b]ecause I felt unsafe." But S. decided not to call her mother because she was afraid Diazleal-Diazleal would "hurt me."

> [W]hen he grabbed my leg, I got scared. And I took his phone off the charger and I ran into the bathroom. I ran out of the room and into the bathroom, and — with the phone, and I was going to call my mom, but I got scared.
>
> Q. And why did you get scared when he touched your mid-thigh?
> A. I got — no, I didn't get scared because of that. I got scared because I thought if I called my mom, he would, like, hurt me, or he would try to like — I felt like he would just try to hurt me.

S. returned to the bedroom. S. refused to sleep with Diazleal-Diazleal in the bed and slept on the floor.

> I went back in the room and I slept. I told him that I wasn't going to sleep with him. I said that I was going to sleep on the floor.
>
> Q. Did he say anything to you after you said that?
> A. He told me to come back on the bed.
> Q. Did he say anything else?
> A. He said — he just said to come back on the bed. And I said no.

S. testified that three or four weeks later, she told Marisol about what happened. S. said she decided to tell her mother because the way Diazleal-Diazleal touched her "didn't feel right." S. told her mother she "didn't want to go over there anymore."

After S. testified, the defense attorney told the court, "I . . . [j]ust wanted to give notice . . . I'm going to ask the court to reconsider its admission of the [ER] 404(b) . . . in regards to [S.]." The court asked what the defense proposed. The defense attorney stated, "Well, I ask the court to instruct the jury to disregard that testimony." But the defense attorney suggested, "[M]aybe the court needs to hear [R.]'s testimony first."

The prosecutor pointed out the defense included the reference to "sexual contact" in the limiting instruction. The prosecutor noted that typically, the court reads the ER 404(b) limiting instruction after the testimony to reflect the testimony "exactly." The prosecutor argued S.'s testimony showed a common scheme or plan of grooming.

> I disagree that this is not testimony for common scheme or plan. It is still doing exactly what I offered before, that his scheme or plan is to get the girls alone in a bedroom, in the bed, and begin sexual contact, which [R.] will testify, I believe so, that from the age of 5 is how the contact occurred, is in the bedroom, at night, while she was alone. And so I think that is consistent with what [S.] testified to.

The court stated:

> [S.'s] testimony at trial was more limited than [her interview]. But she did testify it made her uncomfortable, in fact, to the point where she wanted to call her mother, and she was frightened. She described it as . . . her father grabbing her legs, and then when she was asked to describe it further, she described it lasting 10 seconds, he was moving his hand slowly. Clearly made her very uncomfortable.

But the court agreed to defer ruling on the defense motion to reconsider the decision to admit the ER 404(b) evidence and strike S.'s testimony until after R. testified.

R. was the final witness in the State's case in chief. R. testified in detail about repeated sexual molestation beginning at age 5 and rape from age 10 to 14. R. testified the sexual abuse stopped after Diazleal-Diazleal left the state in 2011. R. testified that when Diazleal-Diazleal returned in 2014, she "was very anxious" and "just started crying." R. testified she did not want her mother to get "back together" with Diazleal-Diazleal because "I didn't want him to move in with us." R. feared "[t]he touching and the rape" would "start up again."

R. noticed "[S.] was acting very odd" after spending weekends with Diazleal-Diazleal. R. was "concerned" Diazleal-Diazleal was abusing S. When R. told her high

school boyfriend "the whole truth" about Diazleal-Diazleal sexually abusing her, "he said I have to tell my mom, I have to." The court admitted and R. read the letter she wrote to Marisol to the jury.

After R. testified, defense counsel asked the court to reconsider the decision to admit S.'s testimony under ER 404(b). The defense argued S.'s testimony did not show a common scheme or plan.

> The [ER] 404(b) evidence that [S.]'s presenting, frankly, becomes a little bit confusing, because it's not sexual in nature. It's also — the only similarity to it is it happened in bed. But I would argue that the other similarities and other common scheme or plan issues are simply not there.

The defense attorney argued S.'s testimony was also unnecessary and prejudicial because "[R.]'s . . . got a very powerful, persuasive demeanor."

The prosecutor argued the testimony was admissible as res gestae to show that R. disclosed her sexual abuse when she noticed a "behavior change" in S. The prosecutor argued the testimony was admissible under ER 404(b) to show a common plan or scheme of grooming.

> The testimony has came out both [S.] and [R.] — in fact, there was a touch that [S.] was uncomfortable with that happened weeks before, and that she felt compelled to tell her mother.
> That is coinciding with the time that [R.] noticed the behavior change, and that [R.], in fact, wrote the letter. And so it's necessary for the res gestae why [R.] told her when she told her, especially knowing that there is a claim that this is fabricated. So I think it's necessary for that, but also for the [ER] 404(b) for common scheme or plan.
> The exact thing that I argued was that there is a grooming that happens, that it happens in the bedroom, at night, with no one else around in the bedroom, in the bed. That's exactly what [R.] described as the first contact that she had with the defendant for sexual contact. And so because it didn't turn into a very sexually explicit contact — and I've never argued that there was sex between the defendant and [S.]. I do believe that there is still evidence to support the common scheme and plan,

13

particularly the grooming of [R.] to get her ready for later sexual intercourse.

The prosecutor reiterated the limiting instruction the court read to the jury included the reference to "sexual contact." The prosecutor noted that the defense "made a strategic decision" to ask the court to give the defense limiting instruction before the testimony.

The court rejected the argument that the testimony was admissible under res gestae "for the same reason" as pretrial because the testimony was not necessary to explain the timing of R.'s disclosure.

The court expressed concern about retroactively reconsidering the decision to admit the testimony and striking the testimony.

> I have not seen reference to any case law about retroactively, after the (inaudible) testimony, striking evidence under [ER] 404(b). So I'm a little bit at a loss here. . . .
> And the case law just isn't very helpful. The only thing that would come from this is — if the motion were to be granted, would be me telling the jury, "Forget you heard that," and it would preclude Ms. [Prosecutor] from arguing what [S.] testified about. Right?
> [DEFENSE COUNSEL]:    Yes.

The court states, "[H]ere's why I am uncomfortable about it. Because, frankly, the reference to defendant had sexual contact with her sounds an awful lot like a comment on the evidence."

The prosecutor reiterated that "what has been put to the jury, that that contact was sexual, came from defense." The prosecutor agreed not to argue that S.'s description was "sexual in nature." But the prosecutor asserted the evidence showed grooming under ER 404(b). The prosecutor pointed out that "as with any witness, you don't know what they're going to testify. You have an anticipation." The court noted, "[E]specially when it's a child."

14

The court denied the motion to reconsider the decision to admit the ER 404(b) common plan or scheme testimony of S. "I think that the state can argue, if it wishes, that this is grooming behavior, defense can argue it's not." The court denied the motion to strike the testimony.

The court then addressed whether to give the defense proposed limiting instruction as part of the written jury instructions. The court expressed concern about giving the instruction without deleting the "reference to sexual contact." "I mean, something that reflects actually what she said rather than terming this as sexual contact." The court asked defense counsel to consider whether to give the proposed instruction or modify the instruction.

> I'm going to ask counsel to think about whether you want this instruction that you asked me to give before [S.] testified to be repeated as part of the court's written instructions to the juror, whether you would like it to be modified in some fashion, and if so, let me know how.

Diazleal-Diazleal's brother Juan and sister-in-law Mary testified on behalf of the defense.[5] Juan testified that R. did not "appear afraid" of Diazleal-Diazleal and she "looked at him" like "he was father all the time." Mary testified she and Juan asked Marisol and R. about the accusations against Diazleal-Diazleal. Mary said that during the conversation, R. did not cry or "appear scared." Diazleal-Diazleal did not testify.

At the conclusion of the evidence, the court addressed the proposed jury instructions. The defense attorney told the court the defense did not want to give the limiting instruction with respect to S.'s testimony as part of the written instructions provided to the jury. "I'm just asking you to leave it all out at this point."

---

[5] We refer to Juan Diazleal-Diazleal and Mary Ciesleski by their first names for clarity.

During closing argument, the prosecutor described the explicit and detailed testimony of R. about sexual abuse and grooming that began at age 5 and rape that began when she was 10 years old until Diazleal-Diazleal left the state when she was 13 years old. The prosecutor touched on S. spending time with Diazleal-Diazleal after he returned to Washington and why R. made the decision to disclose the sexual abuse. "And you remember [R.] said, 'I was going to take this to my grave, I wasn't going to tell a soul about this, but then I started to see myself in my sister.' "

During closing argument, defense counsel questioned the timing and credibility of the disclosures R. and S. made to Marisol.

> Before [R.] submitted this letter — which you will have a chance again to see in evidence, Exhibit No. 1 — before Marisol spoke to [R.] about what was in that letter, and before Marisol spoke to [S.], there was a conversation that [Diazleal-Diazleal] had with Marisol. . . .
>
> . . . .
> After this conversation, we learned that [R.] came out and said to her mom what happened, and we also learned that [S.] eventually came out and said that [Diazleal-Diazleal] was doing things to her. . . .
>
> . . . .
> . . . And these accusations, these stories only came out after the argument that [Diazleal-Diazleal] and Marisol had when [Diazleal-Diazleal] was ready to take [S.] away, and Marisol said, basically, "No one's going to give you custody of these kids because the abuse you give to me, [R.] and [J.]."
>
> . . . .
> As a parent, Marisol is meant to protect and believe her children, [R.] and [S.]. Her loyalty ultimately was not to [Diazleal-Diazleal]. Her first reaction was to believe [R.], then to believe that [Diazleal-Diazleal] did something to [S.]. This reaction was normal and it's expected from a parent.

The attorney argued R., Marisol, and "other witnesses in this case, including the defense witnesses, may be lying intentionally or unintentionally."

> They may be misled, they may be confused. They may be angry. There may be false memories. There may be motive to say what they are

16

saying. These are all reasonable alternatives, and I'm going to talk to you about it. . . .

. . . .

. . . But you need to question, then, the reliability of the information that you are receiving when this is the thought processes that people use, because you need to consider alternative explanations for the allegations.

. . . .

And the reality is, being objective and open-minded includes the following questions: Could a child be lying or fantasizing? Could the child have been coached? Could the child have been misunderstood? Could someone else besides the suspect be the perpetrator?

The defense attorney emphasized the jury had to focus on determining whether the State proved beyond a reasonable doubt that Diazleal-Diazleal was guilty of the charged crimes. The attorney admitted R.'s testimony was "very powerful, it's emotional," but argued her "memory reveals problems in her testimony. Again, remarkable whether she remembers when she was a child. But her memory was weaker when asked about interviews she gave less than a year ago." Defense argued that "missing information" and "misinterpretations" during R.'s testimony established reasonable doubt.

Defense counsel told the jury that the testimony of S. demonstrated the weakness of the State's case against Diazleal-Diazleal.

> You also heard about [S.] — and [S.] testified, and you heard that [Diazleal-Diazleal] touched her mid-thigh. That evidence didn't come out through the defense case; it comes out through the state's case. And you need to question the case and demand that the government say why they have presented this evidence. What's the connection between [S.] and [R.]? Because it's not the defense that's putting that connection together, it's the government.
> And one explanation for it I will argue is that the government's case is so weak that they are trying to produce evidence that [Diazleal-Diazleal] is this sort of guy. To convict him not because of what he did to [R.], but convict him because of the sort of character he is. And it shows a fundamental weakness in the state's case.

The defense addressed the differences between the testimony of S. and R.

> And ultimately, there are significant differences between what [S.] told you and what [R.] told you. For example, did — is the evidence that [Diazleal-Diazleal] told [S.] to keep it a secret or "I will kill you"? Because arguably, touching [S.] on her thigh is pretty significant. But he doesn't say — at least the evidence doesn't show us that he told her to keep it a secret.

The jury found Diazleal-Diazleal guilty as charged of two counts of rape of a child in the first degree and one count of rape of a child in the second degree of R. By special verdict, the jury found Diazleal-Diazleal and R. were "members of the same family or household." With an offender score of 7, the court imposed a concurrent 236-month sentence.

Appeal

Diazleal-Diazleal seeks reversal of the jury verdict. Diazleal-Diazleal contends (1) the court erred in denying his motion to strike the ER 404(b) testimony, (2) the court erred in overruling his objection to demeanor testimony, and (3) cumulative error denied him of the right to a fair trial.

1. Denial of Motion to Reconsider Admission of ER 404(b) Evidence and Strike Testimony

Diazleal-Diazleal contends the court erred in denying his motion to strike S.'s testimony because the testimony did not show a common plan or scheme under ER 404(b).

We review the trial court's interpretation of ER 404(b) de novo as a matter of law. State v. Gresham, 173 Wn.2d 405, 419, 269 P.3d 207 (2012); State v. Fisher, 165 Wn.2d 727, 745, 202 P.3d 937 (2009). Where, as here, if the trial court interprets ER 404(b) correctly, we review the court's decision to admit ER 404(b) evidence of other

crimes or misconduct for an abuse of discretion. <u>Gresham</u>, 173 Wn.2d at 420; <u>Fisher</u>, 165 Wn.2d at 745. A trial court abuses its discretion if the decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. <u>State v. Magers</u>, 164 Wn.2d 174, 181, 189 P.3d 126 (2008).

ER 404(b) is a categorical bar to admission of "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." <u>Gresham</u>, 173 Wn.2d at 420. Before admitting evidence pursuant to ER 404(b), the trial court must

> "(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect."

<u>Gresham</u>, 173 Wn.2d at 421 (quoting <u>State v. Ty Thang</u>, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). Where the evidence is admissible for a proper purpose, the party against whom the evidence is being offered is entitled to a limiting instruction "informing the jury that the evidence is to be used only for the proper purpose and not for the purpose of proving the character of a person in order to show that the person acted in conformity with that character." <u>Gresham</u>, 173 Wn.2d at 420 (citing <u>State v. Saltarelli</u>, 98 Wn.2d 358, 362, 655 P.2d 697 (1982)).

One proper purpose for admission of evidence of prior misconduct is to show a common scheme or plan. <u>Gresham</u>, 173 Wn. 2d at 421-22; <u>State v. DeVincentis</u>, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). Evidence is admissible to prove a common scheme or plan where an individual uses a plan to perpetrate separate but very similar crimes. <u>Gresham</u>, 173 Wn.2d at 421-22. Evidence is admissible to show that the defendant has

developed a plan and has again put that particular plan into action. Gresham, 173 Wn. 2d at 422. The prior misconduct and the charged crime must demonstrate common features such that they are naturally explained as a general plan of which the two are simply individual manifestations. Gresham, 173 Wn. 2d at 422. Mere similarity in results is insufficient. Gresham, 173 Wn. 2d at 422. "[W]hile the prior act and charged crime must be markedly and substantially similar, the commonality need not be 'a unique method of committing the crime.' " Gresham, 173 Wn.2d at 422 (quoting DeVincentis, 150 Wn.2d at 20-21).

Common scheme or plan evidence of "a defendant's 'grooming' behavior" is frequently admitted in sex offense cases. State v. Hecht, 179 Wn. App. 497, 508, 319 P.3d 836 (2014); see 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 404.20 n.13, at 541 (5th ed. 2007) (citing State v. Krause, 82 Wn. App. 688, 919 P.2d 123 (1996); see also DeVincentis, 150 Wn.2d at 22-24; State v. Slocum, 183 Wn. App. 438, 455, 333 P.3d 541 (2014).

Diazleal-Diazleal asserts the court agreed S.'s testimony at trial did not show common scheme or plan under ER 404(b). The record does not support his assertion.

Pretrial, the court ruled the transcripts from the interviews with R. and S. showed a common plan or scheme of grooming under ER 404(b).

> The defendant began with touching and rubbing of [R.]'s and [S.]'s legs and stomach areas, something that the state . . . referred to as grooming behavior. . . .
>     . . . .
>     . . . [S.]'s descriptions of the defendant's actions touching her legs and her stomach while she was in bed, wrapping his arms around her legs — and at some point I think she describes that as being above the knee — and telling her not to tell her mother, are sufficiently similar to [R.]'s descriptions of the initial staples of her own abuse by the defendant that they are probative of a common scheme or plan.

At the request of the defense, the court instructed the jury before S. testified that her "accusations that the defendant had sexual contact with her" were admitted "for the limited purpose of showing a common scheme or plan regarding the charged crimes involving [R.]." The court unequivocally instructed the jury, "You must not consider this evidence for any other purpose."

S. testified that when she stayed with Diazleal-Diazleal, she slept in the same bed with him. S. testified that one night, Diazleal-Diazleal slowly rubbed her mid-thigh area until she told him to stop. S. testified she was upset and fearful as a result of the inappropriate touching and did not feel safe with Diazleal-Diazleal. The evidence showed that before disclosing what happened, S. was very upset and told her mother she did not want to spend time with Diazleal-Diazleal.

After S. testified, the defense attorney noted the defense planned to ask the court to reconsider the admission of S.'s testimony as evidence of a common plan or scheme. The attorney asserted, "What [S.] has testified to on the stand, in my opinion, it does not, at this point, show common scheme or plan. And what she's describing at this point is a — that my client's hand touched her thigh. That, by itself, quite frankly is not sexual in nature."

The court disagreed with the defense attorney's characterization of S.'s testimony. "Well, she didn't just say he touched her thigh." Defense counsel agreed. "Well, that's correct. I mean, she did give some other testimony. But the touching itself is — in my opinion, it's not the same evidence that the court refers to as part of the [ER] 404(b) motion." The defense attorney argued:

> I don't believe that the evidence actually supports common scheme or plan, based upon what [R.] described in her testimony and now what [S.]

described in her testimony, because I think the offer of proof that was presented in the interviews was — at least [S.]'s interviews, were very different common scheme or plan.

. . . .

. . . [T]he only similarity to it is it happened in a bed. But I would argue that the other similarities and other common scheme or plan issues are simply not there.

The prosecutor argued S.'s testimony showed "there is a grooming that happens, that it happens in the bedroom, at night, with no one else around in the bedroom, in the bed." The prosecutor further argued the testimony supported common scheme or plan because "[t]hat's exactly what [R.] described as the first contact that she had with the defendant for sexual contact." The prosecutor argued the evidence was similar to "the grooming of [R.], how [R.]'s contacts started." The prosecutor asserted, "[S]triking her testimony is not the remedy."

The court disagreed with the defense attorney that S. "testifies differently" than in the interview. "[N]o . . . , she testifies the same way, she just leaves out a bunch of stuff."

[T]here's a lot of details that seem to be coming out with [S.]'s testimony that I thought, at the time, was sufficiently similar to the offer of proof with respect to [R.]'s testimony that it should be admitted as evidence of a common scheme or plan.

The court adhered to the decision that the testimony showed a common scheme or plan of grooming and denied the motion to reconsider and strike the testimony of S. The court stated the parties could both argue whether the conduct S. described "was or it wasn't sexual contact." See State v. Harstad, 153 Wn. App. 10, 21-22, 218 P.3d 624 (2009) (A person of common intelligence could be expected to know the victim's "upper inner thigh, which puts the defendant's hand in closer proximity to a primary erogenous zone than touching the hip does, was an intimate part.").

22

The court did not abuse its discretion in ruling the evidence showed a common plan or scheme of grooming. The testimony of S. about the touching that occurred when she was alone at night in the same bed with Diazleal-Diazleal was substantially similar to R.'s description of Diazleal-Diazleal's initial sexual abuse.

Diazleal-Diazleal also argues the court erred by denying the request to strike the testimony. Citing ER 103 and 5 Karl B. Tegland, Washington Practice: Evidence Law and Practice section 103.8 n.4 and n.5 (3d ed. 2008), Diazleal-Diazleal argues that the trial court "without question has the authority at any juncture to strike testimony and instruct the jury to disregard it."[6] Diazleal-Diazleal contends the court misunderstood its authority to strike the testimony of S. See State v. Gunderson, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014) (court abuses discretion by misconstruing a rule).

Diazleal-Diazleal claims the court did not understand that it had the authority to strike the testimony. The record shows the court questioned "retroactively" reconsidering the decision to admit the testimony. "I'm not aware of any cases where [ER] 404(b) evidence is allowed in and then retroactively stricken." But the record shows the court clearly understood that the defense was asking to strike the testimony and that it had the authority but declined to do so. "The only thing that would come from this is — if the motion were to be granted, would be me telling the jury, 'Forget you heard that,' and it would preclude Ms. [Prosecutor] from arguing what [S.] testified about." After the court denied the motion to reconsider and allowed the State to argue

---

[6] For the first time in his reply brief, Diazleal-Diazleal also cites Kilgore, 147 Wn.2d 288. In Kilgore, the court held the trial court is "free to grant relief if the evidence adduced at trial is not what the prosecutor led the trial court to expect." Kilgore, 147 Wn.2d at 293.

common scheme or plan, the court ruled, "I'm not going to strike it at this point." The court noted, "I think that [S.]'s testimony can be argued by both sides, either way."

We conclude the court did not err in denying the defense motion to reconsider the ER 404(b) common scheme or plan ruling and strike S.'s testimony.

### 2. Demeanor Testimony

Diazleal-Diazleal contends the court violated his right to a fair trial by overruling his objection to impermissible opinion testimony. A witness may not express an opinion, either directly or indirectly, on credibility or guilt. State v. Kirkman, 159 Wn.2d 918, 927-28, 155 P.3d 125 (2007); State v. Demery, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001) (plurality opinion). Improper opinion testimony on the defendant's guilt violates the right to the independent determination of facts by the jury. Kirkman, 159 Wn.2d at 927.

Whether testimony is impermissible opinion testimony depends on several factors, including " '(1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact.' " State v. Aguirre, 168 Wn.2d 350, 359, 229 P.3d 669 (2010)[7] (quoting Kirkman, 159 Wn.2d at 928). A police officer's improper opinion raises additional concerns because "an officer's testimony often carries a special aura of reliability." Kirkman, 159 Wn.2d at 928. But testimony that is based on inferences from the evidence, does not comment directly on the defendant's guilt or on the veracity of a witness, and is otherwise helpful to the jury does not generally constitute an opinion on

---

[7] Internal quotation marks omitted.

guilt. State v. Rafay, 168 Wn. App. 734, 806, 285 P.3d 83 (2012). We review admission of testimony for abuse of discretion. Aguirre, 168 Wn.2d at 359.

In Aguirre, 168 Wn.2d 350, the Washington Supreme Court considered whether the demeanor testimony of a police officer was impermissible opinion testimony on the victim's credibility. The police officer testified about her interview with an alleged victim of domestic violence. Aguirre, 168 Wn.2d at 359-61. After considering the relevant factors, the court rejected the argument that the officer gave impermissible opinion testimony. Aguirre, 168 Wn.2d at 361. The officer "limited her testimony to her objective observations of the victim during their interview as compared to other victims whom [she] had interviewed during her lengthy criminal justice career" and "refrained from stating or implying that the victim had been a victim of domestic violence." Aguirre, 168 Wn.2d at 360.

Diazleal-Diazleal asserts Detective Robinson's testimony about R.'s demeanor is impermissible opinion testimony on credibility and guilt. Detective Robinson testified about the demeanor of R. The court overruled the defense objection to the testimony as improper opinion testimony.

On appeal, Diazleal-Diazleal argues Detective Robinson's testimony that "[R.]'s demeanor was very telling, I have done a lot of cases such as —" gave the jury her opinion that R.'s case was "carefully selected . . . as one that should go forward to charging." The record does not support his argument. The record shows the testimony about R.'s demeanor was based on Detective Robinson's objective observations. And after defense counsel objected, Detective Robinson did not complete the statement that "I have done a lot of cases such as —."

Detective Robinson testified, in pertinent part:

Q. Do you remember [R.]'s demeanor during the interview?
A. I do.
Q. And can you describe for me and the jury?
A. [R.]'s demeanor was very telling, I have done a lot of cases such as —
    [DEFENSE COUNSEL]: Objection. Improper opinion.
    THE COURT: If you can just describe it, please.
A. Excuse me. It was very difficult for her to talk about this whole situation. She was very emotional. You can sense she was shaking, trembling, voice trembled, voice cracked. Her — you just got a sense of — her demeanor was — it was very difficult for her to go over it.
    [DEFENSE COUNSEL]: Objection. Improper (inaudible.)
    THE COURT: Overruled.
Q. (By [Prosecutor]) Was [R.] crying at all?
A. Yes, she was.
Q. Can you talk about the volume of her voice?
A. Very shallow. Again, her voice was cracking and it was quiet, and it was difficult to get the information from her because of this.
    [DEFENSE COUNSEL]: Objection. Improper opinion. Speculation.
    THE COURT: Overruled.

We conclude the court did not abuse its discretion in overruling the objections to Detective Robinson's testimony.[8]

### 3. Cumulative Error

Diazleal-Diazleal argues cumulative error denied him a fair trial. The cumulative error doctrine applies where several trial errors standing alone do not warrant a new trial but when combined, may require a new trial. State v. Grieff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Because we reject Diazleal-Diazleal's arguments, the cumulative error doctrine does not apply.

---

[8] Diazleal-Diazleal also contends Detective Robinson improperly used the term "victim." The record shows Detective Robinson referred to co-interviewer Martha McGuiness by her title as a "the victim advocate." The court stated it had never heard of "victim's advocates referred to in any other way" and concluded the motion in limine only precluded the State from referring to R. as a victim.

We affirm the jury convictions of two counts of domestic violence rape of a child in the first degree and one count of domestic violence rape of a child in the second degree of R.

WE CONCUR: