# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

                  Respondent,

         v.

LESLIE WILLIAM STACH,

                  Appellant.

DIVISION ONE

No. 82035-4-I

UNPUBLISHED OPINION

DWYER, J. — Leslie Stach appeals from his convictions of three counts of rape of a child in the second degree. Stach contends that the trial court erred by admitting certain evidence under the common scheme or plan exception to ER 404(b). Additionally, Stach asserts that the trial court erred both by ruling that the ER 404(b) evidence was relevant to the credibility of the complaining witness and by instructing the jury that it could consider the evidence when evaluating that witness's credibility. Furthermore, in his statement of additional grounds, Stach avers that (1) the trial court erred by allowing the State to file a second amended information during the trial proceeding, (2) his trial counsel's representation was constitutionally inadequate, and (3) he was not informed of the Miranda[1] rights on several occasions both before and after he was arrested. Because Stach fails to establish an entitlement to relief on any of these claims, we affirm the convictions.

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

However, Stach also contends that the trial court mistakenly ordered him to pay supervision fees as determined by the Department of Corrections (DOC). Because the record indicates that the trial court waived the requirement that he pay supervision fees, we remand for the trial court to strike this requirement from the judgment.

I

During the summer before her sixth grade year, C.C. lived in a house owned by her grandmother. C.C. was 11 years old. Also during this time period, C.C.'s uncle, Leslie Stach, resided in the garage of the house with his girlfriend, Amanda Peterson, and his three children. C.C. testified that, during that summer, Stach raped her on three occasions.

On the first occasion, C.C. was "half asleep" in her bedroom. She heard the sound of a creak outside her bedroom door and then the sound of the doorknob move. C.C. then saw Stach enter the room. Shortly thereafter, Stach sat on the edge of C.C.'s bed and turned C.C., who was lying on her side, onto her stomach. C.C. smelled alcohol on Stach's breath. Stach then pulled C.C.'s shorts down to her ankles. Afterward, he "went on his knees and went over" C.C. Stach then put his penis inside C.C.'s vagina and started to move "[u]p and down." While Stach was moving up and down, his penis "was going in and out" of C.C.'s vagina. After approximately 15 minutes, Stach stopped and "laid against the wall." C.C. then stood up and walked to the bathroom. When she returned to her bedroom, Stach was no longer in the room.

On the next occasion, C.C. was in her bedroom, preparing to go to sleep. Again, Stach entered the bedroom and sat on the edge of C.C.'s bed. Stach then got into C.C.'s bed. C.C. was initially lying on her back, but Stach moved her onto her stomach. As on the first occasion, Stach smelled of alcohol. Stach then pulled C.C.'s leggings and underwear down to her ankles. Thereafter, Stach put his penis into C.C.'s vagina. C.C. pretended to be asleep. Stach then moved his penis in and out of C.C.'s vagina. He continued to do so for approximately 10 minutes. Afterward, C.C. again stood up and walked to the bathroom. When she returned to her bedroom, Stach was no longer in the room.

On the third occasion, C.C. was lying in bed. Stach entered C.C.'s room, removed his pants, and "climbed into bed with" her. Again, C.C. smelled alcohol on Stach. Stach then removed C.C.'s pants and grabbed her by the hips, pulling her hips upward. Stach then put his penis inside C.C.'s vagina. While Stach was positioned on his knees, he pulled C.C.'s body toward his body while moving his penis in and out of her vagina. After approximately 15 minutes, Stach laid down on the bed and fell asleep. C.C. then walked to the living room and watched television. Sometime later, Peterson entered the house and discovered Stach in C.C.'s bedroom. Peterson then apologized to C.C. and walked Stach out of the room.

Several years later, C.C. informed one of her friends that Stach had raped her. C.C. testified that she was initially hesitant to inform someone else about what her uncle had done. In particular, C.C. was worried that, by coming forward, her relationships with Stach's children and her grandmother would

3

suffer. A few weeks after telling her friend that Stach had raped her, C.C. informed her mother about what had occurred.

The State charged Stach with three counts of rape of a child in the second degree. Prior to trial, the State filed a motion seeking a preliminary ruling that certain evidence was admissible pursuant to ER 404(b). In this motion, the State asserted, among other things, that Stach had, on a prior occasion, raped another person, T.B. The State claimed that Stach's actions toward T.B. demonstrated that, when Stach raped C.C., he acted pursuant to a common scheme or plan.

Attached to the State's motion were various documents, which indicated that T.B. had reported to the police that Stach had raped her in 2012. An incident report that was attached to the motion stated that the rape occurred at the same residence where C.C. was alleged to have been raped. This report stated that, when T.B. was 21 years old, she and Stach were drinking alcohol at the residence. According to a supplemental report, Stach poured T.B. two drinks mixed with soda and whiskey. These drinks were "extremely strong" and caused T.B. to become intoxicated. After some time, T.B. "passed out." Prior to passing out, T.B. had been fully clothed, wearing jeans, a shirt, a sweatshirt, and tennis shoes.[2]

When T.B. awakened, according to the supplemental report, she was naked. Stach was on top of her and "his penis was inside her." T.B. then asked Stach what he was doing and told him to stop. Stach "began pounding on her really hard" and told T.B. "that she asked for it." Eventually, Stach stopped and

---

[2] T.B. suffered from learning disabilities. She was a frequent overnight guest of Peterson's.

4

"got off" of T.B.  The supplemental report also stated that T.B. and Peterson had been best friends since elementary school.

Defense counsel submitted a brief in opposition to the admission of any evidence regarding T.B.'s allegation that Stach had raped her.  Following a hearing on the motion, the trial court granted the State's motion insofar as it sought the admission of the evidence indicating that Stach had, on a prior occasion, raped T.B.  The trial court reasoned that the incident involving T.B. was substantially similar to the incidents involving C.C. so as to indicate that, by raping C.C., Stach acted pursuant to a common scheme or plan.

The case proceeded to a jury trial.  During the trial, T.B. testified with regard to her allegation that Stach had raped her.  The jury found Stach guilty as charged.  The trial court imposed an indeterminate sentence of 245 months of incarceration to life for each count, to run concurrently.

Stach appeals.

II

Stach first contends that the trial court erred by admitting evidence of his prior sexual misconduct regarding T.B.  This is so, Stach asserts, because the prior bad act evidence was not sufficiently similar to the incidents involving C.C. as to demonstrate that Stach acted pursuant to a common scheme or plan.  We disagree.

A

The correct interpretation of an evidentiary rule is reviewed de novo as a question of law.  State v. DeVincentis, 150 Wn.2d 11, 17, 74 P.3d 119 (2003).

"Once the rule is correctly interpreted, the trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. DeVincentis, 150 Wn.2d at 17. A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. State v. Taylor, 193 Wn.2d 691, 697, 444 P.3d 1194 (2019).

B

As a general rule, "[a]ll relevant evidence is admissible." ER 402. One exception to this general rule is provided by ER 404(b), which states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

It is well established that evidence of other misconduct may be admitted to show that the defendant acted pursuant to a common scheme or plan. In sex offense cases, evidence of "the existence of a design to fulfill sexual compulsions evidenced by a pattern of past behavior" is relevant to whether the crime occurred. DeVincentis, 150 Wn.2d at 17-18. Admission of evidence for this purpose "requires substantial similarity between the prior bad acts and the charged crime." DeVincentis, 150 Wn.2d at 21. "Sufficient similarity is reached only when the trial court determines that the 'various acts are naturally to be explained as caused by a general plan.'" DeVincentis, 150 Wn.2d at 21 (quoting State v. Lough, 125 Wn.2d 847, 860, 889 P.2d 487 (1995)). Notably, however, there is no uniqueness requirement; the similarities need not "be atypical or

6

unique to the way the crime is usually committed." DeVincentis, 150 Wn.2d at 13.

In determining whether evidence of other misconduct is admissible under ER 404(b),

> the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.

State v. Vy Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).

"This analysis must be conducted on the record, and if the evidence is admitted, a limiting instruction is required." State v. Arredondo, 188 Wn.2d 244, 257, 394 P.3d 348 (2017).

C

Turning to the evidentiary challenge at issue, the trial court explained its ruling that evidence regarding Stach's prior sexual assault of T.B. was admissible to establish a common scheme or plan:

> This incident involved the best friend of the defendant's girlfriend, Amanda. TB became intoxicated and passed out. TB was not able to consent to the sexual intercourse based on her intoxication.
>      The defendant believed that CC was asleep, and therefore during the time of the alleged abuse in this case, she could not have consented. The defendant had also been consuming alcohol in both instances. Both assaults took place in the same residence. The residence – the same for TB and CC was in the defendant's residence. As indicated, CC also reported a smell of alcohol on the defendant's breath.
>      The Court finds that these incidents are remarkedly and substantially similar to permit the testimony as to common scheme or plan and show an overarching plan by the defendant. Both of the victims were in a position where they could not consent to sexual intercourse. Both incidents involved persons with whom the defendant had a close relationship. Both incidents happened in the

7

same residence, and both incidents involve the act of sexual intercourse.

The trial court did not err by so reasoning. The incident involving T.B. and the incidents involving C.C. occurred in the same residence. With both T.B. and C.C., Stach had consumed alcohol prior to engaging in sexual intercourse with them. C.C. had been either asleep or preparing to fall asleep on all three occasions. Likewise, T.B. had fallen asleep after consuming alcohol. Stach also removed the clothing of both T.B. and C.C. before engaging in sexual intercourse with them. Moreover, both the incident with T.B. and the incidents with C.C. involved the same sexual act, namely vaginal penetration with Stach's penis. No other sexual act was committed in any of the instances. Finally, both T.B. and C.C. had close relationships to Stach: Stach was C.C.'s uncle and C.C. was close to Stach's three children, whereas Stach's girlfriend, Peterson, had been the best friend to T.B. since elementary school. These relationships were of a type that might cause the victim to choose not to report the sexual misconduct.

These significant similarities are naturally explained by Stach having a general plan. The evidence was properly admitted to show this common scheme or plan. Accordingly, the trial court did not err by admitting the challenged evidence.

III

Stach next asserts that the trial court erred both by reasoning that T.B.'s allegation was probative as to C.C.'s credibility and by instructing the jury that it could consider the allegation with regard to C.C.'s credibility. Again, we disagree.

8

As already explained, when determining whether evidence of a prior bad act is admissible, the trial court must, among other things, "weigh the probative value against the prejudicial effect." Vy Thang, 145 Wn.2d at 642. When a trial court, under the common scheme or plan exception to ER 404(b), balances the probative value and prejudicial effect of evidence of a sexual assault regarding a *prior* victim, the trial court may properly consider such evidence as it relates to the credibility of the *complaining* victim. See, e.g., DeVincentis, 150 Wn.2d at 23-24; State v. Scherner, 153 Wn. App. 621, 658, 225 P.3d 248 (2009); State v. Sexsmith, 138 Wn. App. 497, 506, 157 P.3d 901 (2007).

In ruling that the probative value of the allegation of Stach's rape of T.B. outweighed its prejudicial effect, the trial court reasoned that the evidence was, among other things, relevant to the jury's ability to evaluate C.C.'s credibility:

> [T]his type of evidence is strongly probative because of the issues surrounding child sex abuse, victim vulnerability, the frequent acts and the physical evidence of sexual abuse, the program connected to such accusations and victims of willingness to testify, *and a lack of confidence in a jury's ability to determine a child witness's credibility.*

(Emphasis added.)

As the cited authority demonstrates, the trial court did not err by so reasoning. See DeVincentis, 150 Wn.2d at 23; Scherner, 153 Wn. App. at 658; Sexsmith, 138 Wn. App. at 506.

Nor did the trial court err by instructing the jury that it could consider T.B's allegation with regard to C.C.'s credibility.[3] Here, C.C.'s veracity was the central

---

[3] The trial court's written instruction provided:
Certain evidence has been admitted in this case for only a limited purpose. You may have heard evidence from T.B. concerning alleged

issue in the case. One task before the jury was to evaluate the credibility of both T.B. and C.C. In so doing, the jury would naturally compare T.B.'s account of being raped to C.C.'s accounts of being raped. Then, the jury would naturally consider C.C.'s testimony against the requirements of the to-convict instructions given. In making its judgments, the jury could properly consider its view of T.B.'s allegation in evaluating C.C.'s credibility. See Scherner, 153 Wn. App. at 658.

Accordingly, Stach's assignment of error fails.

IV

In his statement of additional grounds, Stach raises several arguments as to why he is entitled to appellate relief. Because Stach fails to demonstrate that he was prejudiced in any manner at trial, we hold that Stach is not entitled to appellate relief on any of these claims.

A

The first claim that Stach raises in his statement of additional grounds is that the trial court erred by granting the State's motion to file a second amended information during the course of the trial proceeding. We disagree.

We review a decision to grant a motion to amend an information for abuse of discretion. State v. Brooks, 195 Wn.2d 91, 96, 455 P.3d 1151 (2020).

---

misconduct by the defendant on dates other than that of the charged incidents. This evidence may be considered by you only to the extent you find it relevant to issues of whether the defendant was acting pursuant to a common scheme or plan and regarding the credibility of the witnesses. You may not consider it for any other purpose. Any discussion of the evidence during your deliberations must be consistent with this limitation.
Jury Instruction 6.

CrR 2.1(d) allows an amendment of the information "any time before verdict or finding if substantial rights of the defendant are not prejudiced." "Midtrial amendment of a criminal information has been allowed where the amendment merely specified a different manner of committing the crime originally charged . . . or charged a lower degree of the original crime charged." State v. Pelkey, 109 Wn.2d 484, 490-91, 745 P.2d 854 (1987) (citing State v. Gosser, 33 Wn. App. 428, 656 P.2d 514 (1982); State v. Brown, 74 Wn.2d 799, 447 P.2d 82 (1968)). Furthermore, our Supreme Court has explained that

> "[c]ases involving amendment of the charging date in an information have held that the date is usually not a material element of the crime. Therefore, amendment of the date is a matter of form rather than substance, and should be allowed absent an alibi defense or a showing of other substantial prejudice to the defendant."

Brooks, 195 Wn.2d at 98-99 (quoting State v. DeBolt, 61 Wn. App. 58, 61-62, 808 P.2d 794 (1991)).

Indeed, in Brooks, the court affirmed a trial court's ruling that granted the State's motion to file, after both parties had presented all of their evidence, an amended information that changed the range of the charging date of the offense. 195 Wn.2d at 96, 98. In so doing, our Supreme Court reasoned that the date of the offense did not constitute an essential element of the crime charged. Brooks, 195 Wn.2d at 98.[4]

---

[4] In Brooks, the defendant was charged with child molestation in the third degree, which provides, in part:
> A person is guilty of child molestation in the third degree when the person has, or knowingly causes another person under the age of eighteen to have, sexual contact with another who is at least fourteen years old but less than sixteen years old and the perpetrator is at least forty-eight months older than the victim.

RCW 9A.44.089(1).

11

Here, the State moved to file a second amended information after trial testimony revealed that Stach had raped C.C. in the summer of 2015. The second amended information changed, for each count, the range of the charging dates from April 27, 2016 through October 1, 2016, to April 27, *2015* through October 1, 2016. Because the date of the offense was not an essential element of the crimes charged,[5] the second amended information did not change the essential elements of these crimes. Moreover, when the State filed its motion, defense counsel did not raise any objection to the amendment.

Accordingly, the trial court did not err by allowing the State to file the second amended information.

B

Next, Stach asserts that his trial counsel provided "inadequate representation."[6] This is so, according to Stach, because his trial counsel, prior to the commencement of trial, "instructed [him] not to contact" another attorney whom Stach asserts that he had already retained.[7] There are several reasons why Stach is not entitled to appellate relief on this claim.

First, Stach does not provide any citation to the record in support of this claim. See RAP 10.10(c). It appears that this claim (if it is a claim that he was denied the assistance of private counsel of choice) relies on facts that are not

---

[5] In both the amended information and the second amended information, Stach was charged with three counts in violation of RCW 9A.44.076, which provides:
> (1) A person is guilty of rape of a child in the second degree when the person has sexual intercourse with another who is at least twelve years old but less than fourteen years old and the perpetrator is at least thirty-six months older than the victim.
> (2) Rape of a child in the second degree is a class A felony.

[6] Statement of Additional Grounds at 1.

[7] Statement of Additional Grounds at 2.

within our record. As such, the issue presented cannot be resolved on direct appeal. See State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

Moreover, to establish a claim of ineffective assistance of counsel, the defendant bears the burden to prove that

> (1) defense counsel's representation was deficient, *i.e.*, it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, *i.e.*, there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different.

McFarland, 127 Wn.2d at 334-35

Stach does not claim that his attorney's performance at trial fell below an objective standard of reasonableness. Nor does he demonstrate how he was prejudiced by his trial counsel's actions. On the record presented, Stach makes no actual claim that his attorney acted below this standard of care. For these reasons, Stach is not entitled to appellate relief on this claim.

C

Stach also contends that he was not read the Miranda rights when a police detective attempted to interview him on two occasions before he was arrested. Stach also asserts that he was not read the Miranda rights after he was arrested. Because Stach does not contend that any unwarned statements were impermissibly admitted at trial, his claim fails.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. To assure that an accused is accorded this privilege against compulsory self-incrimination, the United States Supreme Court in

<u>Miranda</u> set forth procedural safeguards to be employed during custodial interrogation. Specifically, an accused must be clearly informed of his or her right to remain silent and right to counsel, either retained or appointed, and that any statements made can and will be used against the individual in court. <u>Miranda</u>, 384 U.S. at 467-72. The remedy for the failure to be informed of these rights is the exclusion of unwarned statements. <u>United States v. Patane</u>, 542 U.S. 630, 641-42, 124 S. Ct. 2620, 159 L. Ed. 2d 667 (2004) (plurality opinion); <u>Patane</u>, 542 U.S. at 644-45 (concurring opinion).

Stach does not assert that any statements were admitted at trial in violation of <u>Miranda</u>. Additionally, Stach does not provide any citation to the record in support of his claim. <u>See</u> RAP 10.10(c). Accordingly, this assignment of error fails.

V

Finally, Stach contends that the trial court mistakenly ordered, as a condition of community custody, that he pay supervision fees as determined by the DOC. We agree.

RCW 9.94A.703(2)(d) provides that, "[u]nless waived by the court, as part of any term of community custody, the court shall order an offender to: . . . [p]ay supervision fees as determined by the department." Because the "'supervision fees are waivable by the trial court, they are discretionary [legal financial obligations].'" <u>State v. Bowman</u>, __ Wn.2d __, 498 P.3d 478, 489 (2021) (quoting <u>State v. Dillon</u>, 12 Wn. App. 2d 133, 152, 456 P.3d 1199, <u>review denied</u>, 195 Wn.2d 1022 (2020)).

At sentencing, the trial court imposed a $500 victim assessment fee, "reserve[ed] the issue of restitution," and "waiv[ed] the other financial obligations in the case." However, the judgment and sentence signed by the judge required Stach to "pay supervision fees as determined by DOC." On remand, this requirement must be vacated. See Bowman, 498 P.3d at 489-90; Dillon, 12 Wn. App. 2d at 152.

The convictions are affirmed. The cause is remanded to the trial court to vacate the requirement of payment of supervision fees.

_____

WE CONCUR:

_____            _____